952 F.2d 397
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jean Pierre LANGLOIS, a/k/a Michel Juteau, Defendant-Appellant.
 No. 90-5224.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 30, 1991.
Decided Dec. 19, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. (CR-88-19-K), Frank A. Kaufman, Senior District Judge.
 Argued: Joel D. Seledee, Baltimore, Md., for appellant; Harvey Ellis Eisenberg, Assistant United States Attorney, Coordinator, Mid-Atlantic Organized Crime Drug Enforcement Task Force, Baltimore, Md., for appellee.
 On Brief: Edward Thomas Maxwell, Jr., Baltimore, Md., for appellant; Richard D. Bennett, United States Attorney, Baltimore, Md., for appellee.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Langlois challenges his conviction of possession with intent to distribute 7.8 kilos of cocaine and his sentence in connection therewith. He claims that the evidence of the drugs found in his possession, while he was a passenger on an Amtrak passenger train, should have been suppressed because the district court was clearly erroneous in finding, that under the facts, the law enforcement officers had sufficient information to constitute a reasonable articulable suspicion that he was in possession of illegal drugs so as to allow the officers to detain him and allow police dogs to sniff his luggage. This case is controlled by our holding in United States v. Whitehead, 849 F.2d 849 (4th Cir.1988), and the appellant's conviction and sentence are affirmed.
 
 
 2
 On June 12, 1987, appellant Langlois purchased a one-way first class Amtrak ticket from Miami to New York City. This ticket was purchased for $322 in cash only two and a half hours before the train departed Miami. Appellant arrived at the train only 20 minutes before its departure. The cost of his Amtrak ticket exceeded the cost of an airline ticket from Miami to New York City. When the ticket was purchased, appellant did not provide Amtrak with a call back number.
 
 
 3
 On June 13, 1987, the train arrived in Washington, D.C. at approximately 5:00 p.m. The porter responsible for the car in which defendant's compartment was located was concerned that in the 24 hours since leaving Miami, the defendant had not left the confines of his small compartment. The porter reported this fact to Amtrak police at the Washington station. These officers did not have time to investigate while the train was in the station, and they relayed this information to Amtrak Police Investigator Ronald Ford in Baltimore.
 
 
 4
 Before the train arrived in Baltimore, Officer Ford had checked the Amtrak reservations computer and learned that appellant had made his reservation shortly before the train left Miami, had arrived only a few minutes before the train left, had paid cash for his ticket, which was more than an airline ticket, and that appellant had not left a call back number with Amtrak.
 
 
 5
 Following standard procedures, Officer Ford contacted Baltimore City Police Detective Glen Olivi and asked that Olivi meet him at Penn Station in an effort to interview the appellant aboard the Amtrak train. Olivi was also asked to bring drug detection dogs with him. When the train arrived, Olivi and Ford went aboard, but left the drug dogs and their handlers on the platform. Ford knocked on the door of the compartment or roomette occupied by appellant and announced he was with Amtrak. Appellant opened the door and the officers identified themselves and displayed their credentials, but no weapons or handcuffs were displayed at this time. Appellant became extremely nervous and was visably shaking as he handed over his identification card. Appellant stated that he was returning from Miami after a few days vacation and that he had flown down with some friends. He stated he had one garment bag with him and the officers asked if he would object to a dog sniffing the bag. Appellant asked what was going on, and the officers advised that they were conducting a narcotics investigation. Ford asked for permission to have the dogs sniff the bag and appellant consented and laid the bag on the bed. At this point, the detection dogs were brought on the train one at a time, and each alerted to the presence of drugs in the garment bag.
 
 
 6
 The officers informed appellant that the dogs had indicated the presence of drugs in his garment bag and he and they were leaving the train. Appellant was taken to the Amtrak police office in Penn Station and given an option of consenting to the search of the bag or having the officers apply for a search warrant. Appellant consented and signed a Consent to Search form. The subsequent search revealed seven packs of cocaine in the garment bag. The total weight of the cocaine was 7.8 kilograms. The lapse time between the officers' first contact with appellant and their finding the cocaine was approximately five minutes. After the cocaine was seized, the appellant was arrested. The three year delay between the time of arrest and time of trial was occasioned by the appellant's escape from a halfway house and leaving the United States while he was awaiting trial. He was eventually apprehended in Canada and extradited.
 
 
 7
 Appellant contends that his facts are not governed by United States v. Whitehead because Whitehead mentions thirteen factors that gave rise to a reasonable articulable suspicion that Whitehead was in possession of illegal drugs, but the officers in the present case had only seven of such factors at the time they apprehended him. Appellant attempts to take Whitehead apart, element by element, but this approach is covered by Whitehead at page 858, when it states: "Contrary to Whitehead's argument, we cannot engage in a piecemeal refutation of each individual factor as being consistent with innocence. It is the entire mosaic that counts, not single tiles." Based on the entire record, the officers had sufficient suspicion to approach Langlois and ask him for additional information. Appellant was advised that they were police officers conducting a narcotics investigation. At this point he consented to exposing his garment bag to the police dogs. When the dogs indicated the presence of drugs in his garment bag, the officers had sufficient information to remove appellant from the train.
 
 
 8
 Viewing the factors known by the police before they entered the train, it was reasonable for experienced investigators to have a suspicion that appellant was in possession of illegal drugs.
 
 
 9
 Although the district court denied the suppression motion by finding that the facts were so similar to those in Whitehead that Whitehead was controlling, the refusal to suppress could just as easily been based upon appellant's consent to the dogs sniffing his garment bag.
 
 
 10
 For the above reasons, the conviction and sentence of appellant are affirmed.
 
 
 11
 AFFIRMED.